Filed 12/9/14  P. v. Mendoza CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FERNANDO FLORES MENDOZA,<br><br>    Defendant and Appellant. | A136323<br><br>(Sonoma County<br>Super. Ct. No. SCR569814) |

## I.  INTRODUCTION

Defendant was convicted of the first degree murder (Pen. Code, § 187, subd. (a))[1] of Luis Suarez as well as active participation in a criminal street gang (§ 186.22, subd. (a)).  The jury also found true allegations that defendant was an active participant in a street gang who carried out the murder to further the activities of the gang (§§ 190.2, subd. (a)(22) and 186.22, subd. (b)(5)), personally and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)-(e)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).  Defendant was sentenced to life without the possibility of parole with an additional 25 years to life for use of a firearm causing injury and one year for a prior prison term.

On appeal, defendant argues that the court erred in denying his new trial motion based on his assertion that his trial counsel was ineffective, that there was insufficient evidence to support the gang allegations, that the conviction for participation in a

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

criminal street gang must be reversed and, if the conviction on count 2 is upheld, the trial court was required to stay the term pursuant to section 654.

The conviction for participation in a criminal street gang must be reversed because defendant committed the murder alone. With that exception, we find no error and the remainder of the judgment is affirmed.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Murder*

The evening of April 6, 2009, Gerardo Munoz was sitting on the front porch of his house in Santa Rosa, California, when he heard what he thought was "a little bang in a garbage can down the street." Across the street, he saw a young man wearing a hat walk by and then cross over to the sidewalk in front of Munoz. Munoz couldn't see the young man's face and didn't recognize him.

Munoz lost sight of the young man. A minute later, a car passed, "running slow" and then stopped. He "heard a couple words said" and then a gunshot. Munoz walked toward the car and saw the driver, a man in his early to mid 20's with short hair wearing a hoodie or sweatshirt. Munoz hid himself.

As soon as the car drove off, he went out to the sidewalk and found a body lying there. It appeared to him to be the same person who had walked by his house a few minutes earlier. He tried to administer CPR but the person was already dead. His wife called 911. This call was received at 9:38 p.m.

Munoz described the car as a dark red sedan with an "L" shape, or a straight line, on the trunk. The tail lights were "like five side corner lights . . . a five side pentagon light." The car's wheels were "mag like wheels . . . old style wheels, the chrome wheels." At trial, Munoz was shown photographs of rims and a trunk of a car that was driven by defendant and his then-girlfriend, Nora Montes. He said they were similar. When he was earlier shown the car by Santa Rosa police, Munoz again said he thought the wheels were similar to those of the car he remembered seeing the night of the murder.

Bradley Conners, a detective with the Santa Rosa Police Department, arrived at the scene at 10:00 p.m. Conners ultimately determined the identity of the victim, whose

2

name was Luis Suarez. Conners noticed that there were no bullet casings at the scene and believed it was likely that the weapon used to murder Suarez was probably a revolver. He based this opinion on the fact that there were no casings found at the scene and unlike other guns a revolver's spent cartridges remain in the gun's cylinder after firing.

Kelly Arthur-Kenney performed an autopsy on the victim on April 8, 2009. She discovered five gunshot wounds and recovered four bullets during the autopsy. In Arthur-Kenney's opinion Suarez "died as the result of multiple gunshot wounds [to] his torso."

## B. *Testimony Regarding Events Before and After the Murder*

### 1. *Nora Montes*

The day after the murder, April 7, 2009, the police took defendant, his girlfriend Nora Montes, and defendant's cousin, Marco Meza, into custody. Detective Conners testified about his interview of Montes at her home on April 9, 2009. Montes told him that on the night of the murder she was working at Arby's in Santa Rosa. She called defendant at home, where they lived with his parents, at 9:28 p.m., a time about which she was absolutely certain because she "checked the caller ID" on defendant's home phone. Defendant picked her up at work by at least 10:00 p.m. and possibly later. Montes told Conners she thought it was possible for defendant to leave home at 9:30 p.m., go to the place where the crime was committed and then on to Arby's to pick her up by 10:00 p.m.

Montes also told Detective Conners that when she woke up the next day (April 7, 2009) at around 11:00 a.m., defendant was not home. Later that afternoon, defendant told her to go with his cousin, Guadalupe Flores, to pick up the burgundy colored Lexus he and Montes both drove. Montes told Conners "that she and [defendant] had had a conversation about the fact that there had been a shooting in the South Park area and that he told her that he wanted her and their baby to be safe, so she needed to get rid of the vehicle."

3

Montes also testified about the events that occurred the day and night of the murder and in the days afterward. On April 6, defendant dropped her off at work earlier that day, driving the burgundy Lexis. Her shift ended that day at around 10:40 p.m. She called defendant at home at 9:28 p.m., a time she remembered specifically because, as she explained, "I looked at the . . . caller ID when I came home because I always check the caller ID." She recalled seeing several other calls, but she did not check the time those incoming calls were received, despite the fact that she had claimed that she "always" checked the caller ID.

Defendant arrived "right away" after she called him and was alone in the car. Montes put the time of his arrival at her work at "9:30, 9:30 something he was already outside." She did not recall making a contradictory statement to the police earlier that defendant arrived at her work at around 10:30 p.m. Montes admitted that it would have taken defendant between 10 and 15 minutes to get to her work from his house and that he actually probably arrived to pick her up at around 9:40. She also did not recall telling the police earlier that her child was with defendant when he picked her up that night. She admitted that she lied to the police about that fact.

The next day, April 7, when she woke at 8:00 a.m., defendant was with her. She then dropped him off at a friend's house. She didn't know who the friend was. She later went to work, and then met defendant at his cousin Guadalupe Flores's house after work. At around 11:00 p.m., she and defendant did some errands, and she dropped him back off at Flores's house. At about 1:00 a.m., he returned. When she woke the following morning he was gone, and then returned a short while later with his cousin, Marco Meza.

At around 11:00 a.m. on April 8, she, Meza and defendant went to several car dealerships in order to trade in the Lexus. According to Montes, they were trading in the car because defendant had told her a week earlier "that he was in a fight. And since we lived in the area of South Park, I didn't want to get my windows . . . broken or my tires slashed . . . because . . . he was in a fight with some Norteños." Defendant also said that "he wanted me and him and the baby to be safe."

4

Montes agreed that defendant may have made this comment about selling the car to keep them safe after he showed her a newspaper article about the April 6 murder of a Norteño.  Montes also admitted that she initially gave the police other, more neutral reasons for wanting to trade the car in before she told the truth.  In fact, she had not talked to her mother-in-law, the car's owner, about trading it in, and she did not have the pink slip with her when she was visiting dealerships.

As she was driving away from the car dealerships, she was stopped by the police.  Montes was ultimately charged with being an accessory to murder and released later that night.

### 2.    *Marco Meza*

Meza testified that on the date of the murder, he was a member of a Sureño street gang called "Angelino Heights."  The weekend of April 6, 2009, he was with his mother in Lake County, where he had lived his entire life.  The weekend before April 6, he had been in Santa Rosa for a day and night attending a memorial for a fellow gang member.  His sister, Guadalupe Flores, and her boyfriend Jose Orozco, were with him.  Flores drove them to the memorial in her car, a burgundy Honda Accord.  The Honda was a similar color to the Lexus that Montes and defendant both drove.

On April 6, Meza worked with his dad in the morning and then went to his brother, Jamie Flores's, house.  He was there for three or four hours.  He and Jamie left Jamie's house between 5:30 and 6:00 p.m.  Jamie drove them in his white Honda.  After they left Jamie's house, they "got into a fight with the enemy gang members."  As the incident was occurring, Flores drove by with her son, who was two or three years old.  The fight ended when Flores told him the police were coming.

Concerned that the police were looking for them, he and Jamie got back in the car and went to Hefrain Panteleon's house in Kelseyville.  He and Jamie were at Panteleon's house for two hours.

Meza next had a friend give him a ride to Hopland, and from there he met his sister and drove with her in her red Honda to her house in Santa Rosa.  At around 10:30

p.m. the evening of April 6, he and Flores picked up a friend and then went back to her house, where they stayed the rest of the evening.

At around 11:30 or 12:00 p.m., defendant called. Defendant told Meza that "it finally happened." Meza understood that to mean that defendant "had killed somebody." Meza explained that he "had seen one of his [defendant's] guns two months before, and he would talk about wanting to put in work and stuff" on behalf of the gang.

Meza went to sleep and in the morning, defendant came over. Defendant showed Meza a newspaper story about the murder. After the other people in the house left to do an errand, defendant and Meza had a longer conversation about the incident. Defendant told Meza that the victim was a "mayate," an "African-American guy, with a[n] afro." Defendant described the incident to Meza as follows: "[H]e [defendant] was driving around with his loud music in the car. He had seen these two guys, and they were mad-dogging him, giving him dirty looks. So he goes up to the park, and he gets off. He's walking around. He don't see nobody, so he gets back in his car. And that's when he drives away, and he sees that same guy. And that's when everything happened, I guess." Defendant said the man he killed was alone, and "he [defendant] walked up to him and told him that he was his friend, that he was a Norteño also. And he had shot him." Defendant also told Meza that he then went to Hector Santana's house to drop off the gun and the car. Meza had seen the gun before: it was a .38 revolver that defendant generally kept in a safe in his mother's house.

Meza hung out with defendant for three or four hours by themselves at Flores's house. At some point, Flores came home, and defendant's girlfriend, Montes, and her daughter also came over. Montes dropped her daughter off with defendant so she could go to work. Montes's daughter spent the night at Flores's house with defendant.

During the day, while he was with defendant, Meza admitted texting "some girls . . . that like gangsters" and "took credit" for the murder.

With regard to his gang membership, Meza testified that he became a member of Angelino Heights when he was 12. Defendant became a member sometime before the murder, although Meza could not remember the exact date. Meza was present during

6

defendant's "beat down," when he was initiated into the gang. Jose Orozco was also a member of the gang, and because he was in the gang a few years longer than Meza, Orozco was considered "OG to me or to the newer generation."

Meza was asked what would happen to a person "who brags about doing a murder of a Norteño who didn't actually do that murder and is a gang member." Meza testified that in this situation, "[t]hey can consider you a snitch or check you, which is a beat down, or stab you or—it depends how personal they take it." He did not, however, take these consequences into consideration when he lied about his role in the murder because he was "on drugs." Specifically, he had smoked marijuana and done methamphetamine on the day after the murder.

Defendant and Meza stayed at Flores's house overnight on April 7, and both took showers while they were there. Defendant had Flores go and get him a change of clothes earlier in the day. At the same time, defendant asked her to give Montes a ride to pick up defendant's car so she would have transportation to get to work.

On April 8, defendant woke Meza and asked him if he wanted to go to his (defendant's) mother's house. At around 9:30 a.m. they went to her house for about two hours. On the way, they stopped at 7-Eleven and bought a newspaper. There was an article in the paper about the murder. There was a picture of the victim and defendant said, "look, that's him."

At defendant's mother's house, he, Montes and defendant went into the back of the house and smoked some methamphetamine. They also looked at the article, and talked about the fact that there was a mention of a "candy red apple car . . . ." Montes and defendant "got worried and were like, they got the description. So they were talking about going to a dealer and changing the car." Meza went with them in the burgundy Lexus to a car dealer. They stayed at that dealership for 10 or 15 minutes and then went to another one. On the way, Defendant and Montes talked about how "[t]hey didn't want to take in the car because it was salvaged, so they were trying to . . . get rid of the car . . . ." After spending 10 or 15 minutes at the second dealership, they left to get something to eat and were pulled over by the police almost immediately.

Meza described his attitude during his initial interview with the police as "not cooperating." Three weeks later, after he "realized [he] wasn't going to go down for something [he] didn't do" he was again interviewed by the police, with a lawyer present. He told the police at that time that defendant was the killer. He did so because he "thought [defendant] was going to stick up for his own rap, and I realized he wasn't. So I wasn't going to go down for it."

### 3. *Jose Orozco*

Jose Orozco was Guadalupe Flores's boyfriend. On April 6, 2009, Orozco, who lived in Santa Rosa, was in Lake County visiting Flores at her mother's house. He spent the night at the house on April 6. During the day, Flores left the house in a red Honda to pick something up at her brother's (Marco Meza) house. Later that day, he and Flores, who was still driving the red Honda, picked up her brother, Marco Meza, at the Hopland Grade. Meza had been in a fight and they were going to take him to Santa Rosa. During the drive, Meza used his cell phone.

They arrived at Orozco's house in Santa Rosa that evening at around 9:00 or 9:30 p.m. Half an hour after they arrived in Santa Rosa, Flores left in her car with Meza. They came back about 15 minutes later with a friend named Cesar. They stayed together all night. About 45 minutes after Orozco woke up the next morning, defendant arrived. He had a newspaper with him that he showed to Orozco. He told Orozco that he had "domed some mayate." Orozco explained that "mayate" was a "put-down" term to describe African-Americans and "domed" meant "[s]hot him in the head."

Orozco and defendant discussed the event for "a couple hours." Defendant told Orozco "how he rolled up on the guy and asked him if he was—if he banged, and then—I don't know. I guess I don't know what the guy said, but that's when he [defendant] said he just started shooting at him." At some point, defendant took a shower. He left a red bag of clothes at Orozco's house. During this time, Flores left the house to return to Lake County to pick up some things she needed to bring back to Santa Rosa.

8

In his initial interview with the police about the April 6 murder, Orozco was not truthful because he didn't want to be involved. In addition, as a gang member, he would not talk to the police about a murder.

With regard to his gang affiliation, Orozco testified that as of April 6, 2009, he was a member of Angelino Heights, a Sureño gang. At that point, he was an "O.G." or "original gangster"—"one of the guys that started, started it or been in it longer than the other ones." Cesar, Meza and defendant were also members at that time. Orozco had been convicted of a gang-related crime (felony vandalism) prior to the April 6 murder. The crime had been committed for the gang's benefit and one condition of his probation was that he was not permitted to associate with gang members.

**4.** *Guadalupe Flores*

Guadalupe Flores is defendant's cousin. Marco Meza is her brother, Jamie Flores her twin, and Jose Orozco her boyfriend. On April 6, 2009, she was living in Lake County with her mother and in the process of moving to Santa Rosa to a studio apartment she planned to share with Orozco and her son. Meza and Jamie lived together in Lake County.

On April 6, in the morning, she drove by Meza and Jamie's house in Lake County. As she pulled into the driveway, her brothers told her to follow them. She followed them down the street and she saw Meza get out of the car "and start fighting a guy." She intervened and told them the cops were coming and to stop fighting. Somewhere between 4:30 and 6:00 p.m., Meza and Jamie left in Jamie's car. Flores went to her mother's house and Jamie and Meza went to a friend's house. At around 8:00 or 9:00 p.m., after going back and forth between that friend's house and her mother's house, she picked up her son and her boyfriend so they could go to Santa Rosa. Meza didn't want to go with her in her car at that point, for fear that the police would recognize her car and know he had been involved in the fight. She met him instead in Hopland at around 10:00

9

p.m., after a friend dropped him off there. They bought gas in Cloverdale with her debit card.[2]

When they arrived in Santa Rosa, Flores took her brother to go pick up a friend of his named Goblin.[3] They hung out and then went to sleep at around 1:00 or 1:30 a.m. She was woken at around 7:00 or 8:00 a.m. when defendant knocked at the door. He was holding a newspaper. Defendant said that "the guy I shot died." Defendant spent the night of April 7 at her house. During the day of the April 7th, Flores picked up Nora Montes and took her to get her car, a Lexus. Flores went back to Lake County to pick up something she needed there, and returned to her house in Santa Rosa at around 9:00 p.m. Defendant and his daughter were at her house, along with Jose Orozco, Meza and Flores's son.

The next day, April 8, defendant and his daughter were gone when Flores woke up. Later in the day, Flores was arrested and taken to the police station. Initially, she gave the police false information because she was nervous. When she was asked about Meza, she told the truth about their whereabouts the day of the murder.

A short time after the first interview, Meza's lawyer advised her to talk to the police again. During this interview, she told the police the truth, including the fact that she "knew who'd killed the guy." She was interviewed by the police a second time shortly afterwards. At that time, she told the police that defendant said to the people in the house that "he shot a wanna be nigger." She didn't recall hearing him use the word "mayate."

Although defendant had told her to burn his clothes, she did not and in fact turned them in to the police department.

---

[2] The timestamp on the gas station receipt was 22:23:59. The receipt was dated April 6, 2009.

[3] Goblin, whose given name is Cesar Cuevas, testified that defendant came to Flores's house that morning.

During the day of April 7, defendant used her cell phone to call and text people. She saw one text that had a reference to a song with the words "chap killer" in it. "Chap killer" refers to killing Norteños.

Flores testified that it was difficult for her to testify, that she feared retaliation, and that she had moved, with the assistance of the district attorney, out of Lake County.

With regard to gang activity, Flores knew her brother Marco Meza, her boyfriend Jose Orozco and defendant were Sureños, and members of the Angelino Heights gang.

C.    *Cell Calls*

Defendant's cousin, Marco Meza, used a cell phone on April 7, 2009, to send texts in which he appeared to take credit for the April 6 murder. However, cell phone logs and cell phone tower locations pinpointed Meza's whereabouts the night of the murder, and suggested that although the day after it occurred Meza claimed to have committed the murder, he was not actually in Santa Rosa when the murder took place. In contrast, defendant's cell phone use indicated that he was in Santa Rosa that evening.

Meza testified that the cell phone he used on April 6, 2009, and April 7, 2009, was not his, but was registered to his sister's boyfriend, Jose Orozco.[4] He borrowed this phone because he was "on the run" and "didn't want the cops to track [him] down." On April 6, 2009, this phone was in his possession at all times.

District Attorney Investigator John McCutcheon testified that the phone associated with Meza was used to place 53 calls made between 8:00 p.m. and 11:00 p.m. on April 6, 2009. He stated that the pattern of the calls was consistent with the phone being used first in Lake County between 8:00 p.m. and 10:00 p.m. Tower usage records then indicated that at around 11:00 p.m., Meza's cell phone usage engaged phone towers in Santa Rosa, which would be consistent with Meza driving with his sister from Kelseyville in Lake County, then over the Hopland Grade and into Santa Rosa.

_____

[4] This phone, which had the number 304-6775, was the phone used to send messages on April 7, 2009, claiming responsibility for the April 6 murder.

11

Detective Conners obtained a cell phone log for Meza's phone, and discussed this log with Meza. From the times and locations reflected by the log, it was apparent that the phone used by Meza was used in Lake County at the time the killing occurred. These logs included texts at 2033, 2134, 2332, that said, respectively "[N]ada," "I just cracked a buster" and "going to Santa Rosa. Had to shake the stop."

McCutcheon also stated that a number associated with defendant[5] was in use at various times between 7:27 p.m. and 9:03 p.m. The phone used a cell tower north of Guerneville Road in Santa Rosa.

Meza testified at length about the texts he sent the day after the killing in which he claimed responsibility for the killing. The afternoon of April 7, 2009, while he was at Guadalupe Flores's house he texted Jenee Perez ("the girl that [he was] trying to impress by all this") that he had arrived in Santa Rosa at 8:00 p.m. the night before. As their texts went back and forth Perez "seemed to indicate that she didn't believe [he] had killed this guy . . . ." This made him angry because he was "try[ing] to get the credit . . . to impress her . . . to make myself look good."

Meza's next text said "LOL . . . is that who I got last night in South Park?" In the next text, he wrote "Don't fucking say shit, though. Well, that's the life of a gangster. He told me he was a Norteño, so I let him have it, chap killer." In the texts that followed he said "[w]hy the fuck you crying? . . . [¶] . . . [H]e told me he was a Norteño. Shot that fool. He was screaming like a bitch. That's when I shot the rest. Don't be sad. Be glad."

At that point in the conversation, Defendant arrived, and Meza told Perez that he couldn't answer. Nevertheless, he then texted her, "fuck that. They took my homey— my home 13 Moreno. RIP life 3 shit. They had it coming. About time we get pay

---

[5] Defendant's sister, Yolanda Mendoza, testified that she had a cell phone with the number 228-4464 and defendant borrowed it at some time in April 2009.

12

back.[6]" Meza described the victim to Perez as: "he was like a afro, kind of looks black. What else you want to know." He also told her that the victim was wearing a white shirt and that "the newspaper got their shit twisted. It wasn't a drive-by."

The defense rested without calling any witnesses.

The jury convicted defendant of first degree murder (§ 187, subd. (a)) and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury also found true allegations that defendant was an active participant in a street gang who carried out the murder to further the activities of the gang (§§ 190.2, subd. (a)(22) and 186.22, subd.(b)(5)), personally and intentionally discharged a firearm causing death (§12022.53, subds. (b)-(e)) and personally inflicted great bodily injury (§12022.7, subd. (a)). Defendant was sentenced to life without the possibility of parole with an additional 25 years to life for use of a firearm causing injury and one year for a prior prison term.

This timely appeal followed.

### III. DISCUSSION

**A.** *Ineffective Assistance of Counsel*

Following the guilty verdict, defendant hired new counsel and unsuccessfully moved for a new trial. Defendant now contends the trial court erred in denying his motion because counsel was ineffective on two grounds.[7] First, he asserts that counsel mishandled his alibi defense in that he neither called defendant's parents to the stand nor sufficiently investigated his alibi defense. Second, he contends trial counsel denied him his constitutional right to testify. He is incorrect on both grounds.

---

[6] The reference in this conversation to "Moreno" was to a gang member who had died four years earlier, for whom a memorial had been held in Santa Rosa on April 4.

[7] In his new trial motion, defendant also argued that counsel was deficient because he "was disloyal," in that "[h]e always believed [defendant] guilty . . . ." In addition, he contended that counsel failed to explain why the tattoos defendant got while in prison that indicated he had killed rival gang members were not claims to be taken seriously. Although he mentions these matters in his summary of the issues raised below, he does not make these arguments on appeal, and therefore, we do not address them.

## 1. *Factual Background*

Defendant's alibi was that he was at home with his parents, his girlfriend, Nora Montes, and their child in Santa Rosa when the murder took place, leaving only long enough to drive Montes to work in the mid-afternoon and then again to pick her up in the evening. Based on the time of the 911 call (9:38 p.m.) and Gerardo Munoz's testimony, Luis Suarez was killed within minutes of the time Montes says she called him to pick her up. Given that defendant lived "a few blocks" from the shooting, it was possible that he murdered Suarez, something Montes admitted to Detective Conners.

At the core of defendant's alibi was Montes's testimony at trial that she called defendant on his parents' home phone to ask him to pick her up from work. She recalled the exact time of the call—9:28 p.m.—because she checked the caller ID of the home phone. She testified that defendant arrived 5 or 10 minutes later to pick her up.

When questioned about the precision with which she could identify the time of this particular call, Montes testified that she checked the home phone's caller ID for the time record, although she did not check the time to any other calls on the phone, could not remember the times for any other calls she might have seen, or recall the identity of other callers who might have made calls to that same number.[8]

However, in her interview with Detective Conners at her home on April 9, 2009, Montes gave a different timeline for the events of the evening. Montes told Conners that she was working at Arby's in Santa Rosa the night of the murder and defendant picked her up from work. Conners testified that although Montes "didn't give . . . a specific time . . . she said that it was at least 10 o'clock p.m." Montes told Conners, consistent with her testimony at trial, that she called defendant at 9:28, a time about which she was absolutely certain because she "checked the caller ID." Montes told Conners she thought it was possible for defendant to leave his home at 9:30 p.m., go to the place where the crime was committed and then on to Arby's to pick her up by 10:00.

---

[8] However, she later testified that she did remember from the caller ID that defendant's sister had called at about 9:20 p.m.

At the hearing on defendant's new trial motion, defendant's mother testified that defendant's father received a phone call from Montes at around 9:30 p.m. on the night of the murder, handed the phone to defendant, and defendant left the house shortly afterwards in his Lexus. Defendant's mother had no independent memory of the time of the call, but had simply heard about it from others.

Trial counsel was aware that defendant's parents would testify that the phone call to defendant at their house occurred at 9:30 p.m. According to defendant's parents and Montes, trial counsel confirmed with them that they would not lie for defendant. They further testified that counsel told defendant's parents they were his main witnesses and without them, defendant would be a "lost cause." Defendant testified that trial counsel also set up but then cancelled an appointment to discuss the parents' testimony.

Ultimately, defense counsel did not call defendant's parents as witnesses, although he did place them on the witness list. Instead, as counsel explained at the hearing on the new trial motion, his strategy was to present defendant's alibi, which he considered questionable, through the two strongest methods: Montes's testimony on direct examination and excerpts of defendant's interviews with the police, which were videotaped and shown to the jury. In these excerpts, defendant talked about his whereabouts the night of the murder.

Defendant testified that counsel admitted to him that he had been deficient in not calling defendant or his parents to testify. Defense counsel denied doing so. Instead, when defendant asked him to bring a new trial motion based on ineffective assistance of counsel, trial counsel told him that a lawyer does not make an argument which he believes has no legal basis. Defendant later claimed, however, that he did not remember counsel saying this.

At the hearing on the new trial motion, and in a declaration filed by the People in their opposition to defendant's motion, trial counsel justified his decision not to call defendant's parents on the basis that he believed, on balance, their testimony would not be helpful to defendant. The parents did not have an explanation for why they waited to report defendant's alibi to the police until he was arrested and charged with murder. He

15

believed that the delay in reporting defendant's alibi would appear to be disingenuous and as a result their testimony less believable to the jury. Moreover, counsel made the strategic decision that an alibi presented through defense witnesses would undercut the advantage of having Montes present defendant's alibi as a "friendly" prosecution witness who would seem more reliable than defendant's parents. He also believed that having the alibi further presented through cross-examination strengthened its believability.

With regard to his right to testify, defendant stated in his declaration that counsel told him that he shouldn't testify because the jury would learn he had a prior criminal record. Defendant's criminal record "consisted of a single adult conviction for a felony violation" for possession of a switch-blade. He also told defendant that one of his duties as a lawyer was to refrain from presenting perjured testimony, which made defendant think he believed he (defendant) was lying. Counsel did not tell him that the final decision to testify was his and had he known that he would have testified. Defense counsel told his client that "if he insisted on testifying that that would be taken up with the court." Defendant interpreted this statement as a threat that the court might not allow him to exercise his right to testify in his own defense.

Trial counsel disagreed with defendant's account of their discussions regarding his right to testify. He had in fact explained to his client that he had a right to testify if he chose and that he would honor that decision. He believed defendant's alibi was a weak defense because even given the time of the phone call there was still a window within which the defendant could have committed the murder. He was relieved his client chose to follow his recommendation that he not do so because he "felt very strongly that if he testified and was asked to explain his statements and behavior following his arrest . . . a rapid conviction would follow."

With regard to his statement to defendant that if he insisted on testifying this matter would be "taken up" by the court, he explained that this was a reference to the issue of whether defendant's disregard of his trial strategy would necessitate the substitution of another attorney as defendant's lawyer.

16

Defendant's contention that counsel failed to investigate his alibi was based on the fact that he knew that counsel had hired a private investigator, but he did not know whether counsel "made any effort to develop additional corroboration of [his] alibi." Counsel, however, stated in a declaration that he went to the scene of the murder 6 or 7 times and twice drove the distance "of a few blocks from the Mendoza house to where the murder took place" in order to check the distance between the scene of the murder and defendant's house.

The trial court denied the new trial motion on the ground that defendant had failed to establish he was prejudiced by counsel's performance.

The court specifically found that counsel's decision not to call certain witnesses to the stand (including defendant's parents) were tactical decisions and not prompted by improper motives such as racial animosity or a belief that the witnesses would be lying. Further, the court held that defendant's claim failed because he presented no evidence that he was prejudiced by the manner in which counsel presented his alibi. The court observed that "the jury was presented with alibi evidence . . . that [defendant] provided to the police following his arrest, the testimony of the police detectives regarding their interviews with defendant and Nora Montes, and the trial testimony of Ms. Montes." The court also noted that "[a]lthough Ms. Montes was called as a prosecution witness at trial, she provided testimony that was supportive of defendant's alibi claim." The prosecutor not only questioned Montes closely regarding her alibi testimony, but also discussed it in closing argument. The court concluded that "this is not a case where an alibi defense was not in front of the jury." The court also found that there was no reasonable probability that defendant's parents would have made any difference in his presentation of his alibi in that "neither parent could place defendant anywhere other than the murder scene at the time of the shooting."

The court noted that defendant failed to present any evidence to back up his statement that counsel had not investigated his alibi defense, nor had he established that any further investigation would have established that defendant was somewhere else at the time of the shooting.

17

With regard to defendant's assertion that counsel misinformed him regarding his right to testify, the court found that "trial counsel did inform defendant that the decision whether to testify was defendant's decision to make."

Having concluded that defendant failed to show any prejudice from counsel's performance the trial court denied his motion for a new trial.

### 2. *Discussion*

In general, a defendant who claims that counsel was ineffective must show both that counsel's performance was deficient and that, as a result, defendant was prejudiced. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) In reviewing ineffective assistance of counsel claims, appellate courts are wary of second guessing defense counsel's tactical decisions. (*People v. Hinton* (2006) 37 Cal.4th 839, 876; *People v. Holt* (1997) 15 Cal.4th 619, 703.) Thus, when we review a trial court's finding that a defendant received adequate representation, we defer to the court's decision. (*People v. Andrade* (2000) 79 Cal.App.4th 651, 660.) As the *Andrade* court puts it: " 'After all, the trial court is in the best position to make an initial determination, and intelligently evaluate whether counsel's acts or omissions were those of a reasonably competent attorney.' [Citation.]" (*Ibid.*) For that reason, on appeal we must give great weight to the trial court's findings regarding competency and "[a]bsent a showing of clear and unmistakable abuse, we will not disturb his decision. [Citations.]" (*People v. Wallin* (1981) 124 Cal.App.3d 479, 483.)

We agree with the trial court that defendant failed to show he was prejudiced by counsel's decisions with regard to the presentation and investigation of his alibi defense and that, in fact, counsel did inform him of his right to testify. As the court pointed out, defendant did not put forward any evidence that further investigation of his alibi claim would have shown that he was, in fact, somewhere else when the murder was committed. In addition, defendant's parents' testimony would not have done anything more than corroborate Montes's testimony that defendant received a call from her at around the time she said she made this call. Nothing defendants' parents could have said would have changed the fact that between 9:28 p.m. and 9:38 p.m. defendant would have had time to

drive a few blocks to the scene of the murder and commit the crime. In fact, Montes stated that she believed he would have had time to do so. Moreover, Montes's testimony regarding the specific timing of the call, her shifting story about when defendant arrived to pick her up from work, and the parents' late decision to corroborate her memory of the timing also undermined the alibi.

Further, although the trial court did not specifically find that counsel's representation was not deficient, the record supports a conclusion that counsel's decisions regarding the presentation of defendant's alibi defense were reasonable tactical decisions designed to present what was a weak story in the best light possible. Counsel's decision to present this defense[9] through Montes's testimony as a witness for the People was a reasonable decision designed to give her questionable story an aura of credibility since she was on the stand testifying as a "friendly" witness for the state. Similarly, defendant's description of his whereabouts on the night of the murder was presented to the jury in the form of videotaped interviews he had with the police after his arrest and thus he was not subject to damaging cross-examination. Finally, because defendant's parents would not have added anything new to the alibi evidence, and might well have served to emphasize its weakness upon cross-examination, counsel's tactical decision to forgo using them as witnesses was sound.

Defendant's counter-argument, namely that his parents' testimony would have strengthened Montes's story, does not mean that counsel was ineffective in choosing not to call them. As counsel explained, defendant's alibi was a weak one, and would, in his opinion, be made even weaker by the testimony of his parents. Thus, even if the strategy suggested by defendant might also have been an acceptable course, counsel was not required to adopt this tactic. He employed a trial strategy that he, not incorrectly,

---

[9] The record belies defendant's argument that counsel failed to present his alibi. As we have described, the alibi was presented to the jury in the form of Montes's testimony and the videotape of defendant's interrogation. Counsel's decision not to focus on what he believed to be a weak defense in closing argument was clearly a tactical decision rather than ineffective assistance.

believed would be more effective.  In so doing, he did not render defendant ineffective assistance.

Defendant argues that the court could have found that counsel's alleged failure to do anything of substance to investigate defendant's alibi was prejudicial so long as it found that "the defense was potentially meritorious and therefore could have affected the verdict."  He cites *People v. Shaw* (1984) 35 Cal.3d 535, 541 (*Shaw*) and *People v. Frierson* (1979) 25 Cal.3d 142, 163 (*Frierson*) in support of this argument.

Neither case is helpful, however.  In *Shaw*, defense counsel learned from defendant that a number of people could corroborate his alibi defense.  However, counsel failed to speak to any of these potential witnesses and, in fact, did not present any alibi defense.  In finding that counsel was ineffective, the court stressed counsel's utter failure to take defendant's alibi into account in his representation of defendant.  The court observed that "the record reveals substantial corroboration of the alibi defense which, although it might not have prevailed, at least had the *potential* of prevailing and was sufficient to warrant an adjudication." (*Shaw, supra,* 35 Cal.3d at pp. 541-542.)  Here, the record indicates that counsel not only ensured that defendant's alibi was presented to the jury, but he made tactical choices designed to present it in the most opportune ways. Nor is it the case that there were potential witnesses who could have substantially corroborated defendant's alibi that counsel ignored.  The only other witnesses were defendant's parents and, as we have noted, neither of them would have added to the alibi any information that was not already before the jury.

Similarly, in *Frierson, supra,* 25 Cal.3d at page 163, defense counsel could have put on a diminished capacity defense, but he failed to investigate any aspect of this defense. There, the court held " '[by] his inaction, deliberate or otherwise, counsel deprived himself of the reasonable bases upon which to reach *informed* tactical and strategic trial decisions. . . . . [¶] . . . [E]ven tactical decisions may demonstrate incompetence if made without the benefit of 'substantial factual inquiry.' "  In contrast to counsel in *Frierson*, the defense attorney in this case did make an inquiry into defendant's alibi and presented the relevant facts behind it, namely that the time between

20

the phone call defendant received from Montes and the time of the murder might have been too short a time within which defendant could have murdered the victim. Defendant did not bring to the court's attention any additional witnesses who might have added anything useful to that scenario, and as the trial court pointed out, did not present the court with any documentary evidence that might have strengthened the defendant's alibi. In the absence of any evidence of what additional useful investigation defense counsel could have conducted, we conclude that he was not ineffective in his investigation of defendant's alibi.

## B. *Gang Enhancements*

### 1. *Factual Background*

The jury found true the allegation that defendant participated in a criminal street gang when he murdered Luis Suarez and the trial court imposed a three-year enhancement pursuant to the California Street Terrorism Enforcement and Prevention Act of 1988 (the STEP Act). (§ 186.20 et seq.; Stats.1988, ch. 1242, § 1.)

The People's principal witness regarding the activities of the Sureño street gang to which defendant belonged at the time of the murder was Santa Rosa Police Detective Andrew Riley. From 2006 to 2009, Riley was assigned to the department's gang crimes team and was qualified as an expert "in the area of criminal street gangs pursuant to Penal Code section 186.22, and in particular the Sureño and Norteño street gangs."

In his interviews with defendant during the investigation of the murder, Riley discussed defendant's gang involvement. Defendant admitted to being an Angelino Heights Sureño, a "subset or smaller gang within the Sureño criminal street gang" located in Santa Rosa. In fact, a year earlier, on January 18, 2007, Riley had contact with defendant in an incident in which, as he testified, defendant "was at a gas station and was involved in an altercation with two suspected Norteños. And during the altercation he ended up getting pepper sprayed by the Norteños." This added to Riley's belief that defendant was an active Sureño participant. In sum, it was Riley's opinion, "based on [his] training and experience, the contacts [to which he'd testified], the admissions

21

[defendant] made, as well as his tattoos . . . on . . . 4-6 of '09 [defendant] was an active Sureño participant."

According to Riley, there were several hundred Sureño gang members in Sonoma County. One of the Sureños's primary activities was "committing Penal Code section 245(a)(1) [violations] such as an assault." He identified two specific gang members with whom he dealt in various investigations who had participated in such activities. One, Martin Camacho, was an active Sureño gang member at the time of an assault investigation Riley participated in. Camacho ultimately went to prison for that assault.

He also described another Sureño, Omar Gallardo. Riley was involved in the "investigation of a case where he (Gallardo) and some of his fellow Sureños saw a car driving past them with who they believed were Norteños in the car. They threw a bunch of bottle[s] at the car, beer bottles. The car stopped, and a fight broke out. And during the fight Mr. Gallardo stabbed two different people causing serious injury. And Mr. Gallardo ended up pleading guilty to assault with a deadly weapon, as well as being an active gang participant." In his opinion Gallardo was an active Sureño at the time he committed that offense.

Riley was also familiar with the victim in this matter, Luis Suarez. He had "heard Mr. Suarez's name a couple of times. As I looked further into his police contacts and gang activity, based on my training and experience, it appeared to me that he was an active . . . Norteño in the South Park area of Santa Rosa." One of Suarez's nicknames was "Afro Man." In addition, Riley made a number of observations regarding Suarez's memorial that were of significance in his conclusion regarding Suarez's gang affiliation. He observed graffiti, and red flags, handkerchiefs, and baseball hats that were all characteristic of Norteños.

In his opinion, Suarez's murder was "one hundred percent" a gang-related crime. He opined that Suarez's murder "furthers the criminal street gang because . . . these gangs were formed to protect themselves and are currently in a mode of what they call war with each other. And their main job, these gangs' main jobs is to hurt each other and kill each other. It has been for decades. And it currently is Sureño on Norteño, Norteño on Sureño

22

fights, stabbings, shootings, killings.  And just like any organization if you do—if you commit an act that is part of the main goal of your organization, you're helping your organization."

**2.	*Discussion***

Defendant now argues that substantial evidence does not support the gang enhancement allegation.  Specifically, he contends that there is not substantial evidence to support the jury's findings that (1) the primary activity of the Sureños was assault and murder, and (2) the Sureños engaged in a pattern of criminal gang activity as that phrase is defined by statute.  We disagree with both contentions.

**a.	*Gang's Primary Activities***

In *People v. Duran* (2002) 97 Cal.App.4th 1448, 1457 (*Duran*) the court aptly summarized the law in this area.  "Section 186.22, subdivision (b)(1) imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang.  To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity.  (§ 186.22, subd. (f); *People v. Sengpadychith* (2001) 26 Cal.4th 316, 319-320; *People v. Gardeley* (1996) 14 Cal.4th 605, 616-617; *People v. Loeun* (1997) 17 Cal.4th 1, 8.)"

The *Duran* court further explains that " 'The phrase "primary activities," as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's "chief" or "principal" occupations.  [Citation.]' [Citation.]  Proof that a gang's members consistently and repeatedly have committed criminal activity listed in section 186.22, subdivision (e) is sufficient to establish the gang's primary activities.  On the other hand, proof of only the occasional commission of crimes by the gang's members is insufficient.  [Citation.]  Past offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's

23

primary activities, and thus both may be considered by the jury on the issue of the group's primary activities. [Citation.]" Further, "[t]he testimony of a gang expert, founded on his or her conversations with gang members, personal investigation of crimes committed by gang members, and information obtained from colleagues in his or her own and other law enforcement agencies, may be sufficient to prove a gang's primary activities." (*Duran, supra,* 97 Cal.App.4th at pp. 1464-1465.)

The testimony of Detective Riley, the People's gang expert, constitutes substantial evidence that among the gang's primary activities were the assault and murder of members of rival gangs.[10] Based on the three years he had been assigned to the Santa Rosa Police Department's gang unit, and his considerable expertise specifically concerning Sureño and Norteño gangs in Santa Rosa, Riley testified that one of the primary activities of Sureños in Sonoma County was "definitely" "committing [violations of] Penal Code section 245(a)(1) such as an assault." He described Norteños and Sureños as having been formed to protect each other and thus "currently in a mode of what they call war with each other." As part of this war, these "gangs' main jobs is to hurt each other or kill each other." These activities included "stabbings, shootings, killings." He also described the "goal" of both Norteños and Sureños as the commission of "violent acts."

Defendant, relying on *In re Alexander L.* (2007) 149 Cal.App.4th 605, 612 argues that Riley's testimony was conclusory and based on "vague generalities. We disagree. Riley specifically described the activities of several gang members that fit into his general description of Sureño members engaging in the assault and murder of rival Norteños. First, he described a gang member named Martin Cuevas Camacho (an active Sureño gang member at the time of the Suarez murder) with whom he dealt "on several occasions in different investigations, including one investigation where he ultimately went to prison behind an assault" in 2008 and another Sureño gang member named Omar

---

[10] Assault and murder are among the statutorily enumerated criminal offenses to which the enhancement applies. (§ 186.22, subds. (e)(1) and (e)(3).)

24

Lugo Gallardo who stabbed two Norteños "causing serious injury." Gallardo ultimately pled "guilty to assault with a deadly weapon, as well as being an active gang participant."

The picture Riley painted for the jury was of two gangs, formed to protect their members, whose principal characteristic was that they were "at war." While engaged in this conflict, members of the gang to which defendant belonged committed assault and murder. The record evidences what are essentially five skirmishes in this war, all involving the sort of violence Riley described as the gang's primary activity: an incident in which Meza attacked a Norteño with a baseball bat, defendant's earlier involvement in an attack on Norteños in which defendant was pepper sprayed, Martin Camacho's conviction for assault in an encounter with Norteños, Omar Gallardo's plea for assault with a deadly weapon during a fight that seriously injured two Norteños and, finally, the murder of Luis Suarez, a Norteño, by defendant.

In a similar case, *Duran, supra,* 97 Cal.App.4th at pages 1464-1466, the police gang expert testified that a gang's primary activity was " 'putting fear into the community.' " Through " 'robberies, assault with deadly weapons, narcotics sales . . . they start claiming certain territories within the city . . . . [¶] And they're controlling either the narcotics sales in that area, they're committing the robberies in this area, all for the purpose of fear and intimidation of the community.' " As in this case, the gang expert further corroborated his conclusion with specific examples of situations in which gang members engaged in robbery and narcotics offenses. The court held that this testimony was sufficient to support a finding that this gang's primary activities were the sale of narcotics, robbery, or assault.

In sum, this evidence is sufficient to support the jury's finding that the primary activities of the gang to which defendant belonged were among the required statutorily enumerated offenses.

### b. *Pattern of Gang Activity*

Defendant also argues that there is not substantial evidence of a pattern of criminal gang activity consisting of at least two listed crimes committed within three years of each other as required under the statute. We disagree.

25

"A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period. [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons. [Citations.] The charged crime may serve as a predicate offense [citations], as can 'evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member.' [Citation.]" (*Duran, supra,* 97 Cal.App.4th at p. 1457.)

The testimonial evidence of the charged offense, namely defendant's murder of Suarez, therefore constitutes one of the two predicate offenses. Two other predicate offenses contained in the record, the assault convictions of Camacho and Gallardo, were introduced into evidence through Riley's testimony and through certified court dockets, each of which contained the dates of the offenses described by Riley. Evidence Code section 452.5, subdivision (a) makes admissible "any computer-generated official court records, as specified by the Judicial Council which relate to criminal convictions, when the record is certified by a clerk of the superior court pursuant to Section 69844.5 of the Government Code at the time of computer entry." The court dockets, therefore, are admissible and presumptively reliable. (See *Duran, supra*, 97 Cal.App.4th at p. 1461; Evid. Code, § 452.5, subd. (a).)

c.     *Ineffective Assistance of Counsel*

Defendant argues that, to the extent the People failed to prove what the primary activities of the Sureños were, counsel was ineffective because his cross-examination of Riley may have resulted in providing for the jury the remaining proof needed for a true finding on this enhancement. We have reviewed the record and conclude substantial evidence supports the jury's finding. Moreover, the facts on which this finding is based were introduced by the People and counsel's cross-examination simply clarified a few matters to which Riley had already testified. No ineffective assistance of counsel occurred here.

**C.** *Gang Participation*

Defendant was convicted of carrying out the murder in furtherance of the activities of the gang in which he was an active participant. (§ 186.22, subd. (a).) Defendant now argues that this conviction must be set aside because the People did not show, as required pursuant to *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132, that two or more gang members participated in the murder. The People concede, and we agree, that there is no evidence in the record to support a finding that two or more gang members participated in the Suarez murder. Therefore, the conviction on this count must be reversed.

**D.** *Section 654 Stay*

Defendant argues that section 654 requires that the trial court stay the gang participation sentence. As the People point out, given that we have reversed the gang participation count and thus the corresponding sentence, this issue is moot.

## IV. DISPOSITION

The judgment of conviction of active participation in a criminal street gang (§ 186.22, subd. (a)) is reversed. In all other respects the judgment is affirmed.

27

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.